UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STEVENS COUNTY, *et al.*,<br><br>            Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF INTERIOR, *et al.*,<br><br>            Defendants. | NO. CV-06-0156-EFS<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On August 8, 2007, the Court held a hearing in the above-captioned matter. Marc R. Stimpert and Toni Meacham Pierson appeared on behalf of Plaintiffs, Lori Caramanian appeared on behalf of Federal Defendants, and Brian Segee appeared on behalf of Defendant-Intervenors. Before the Court were Plaintiffs' Motion for Summary Judgment (Ct. Rec. 46), Federal Defendants' Motion for Summary Judgment (Ct. Rec. 52), and Defendant-Intervenors' Cross-Motion for Summary Judgment (Ct. Rec. 50). After reviewing the submitted material and relevant authority and hearing oral argument the Court was fully informed. The Court denies Plaintiffs' motion and grants Defendants' motions for the reasons articulated below.

## I. Background

Plaintiffs, Stevens County, Stevens County Conservation District, Stevens County Cattlemen's Association, and Stevens County Farm Bureau,

ORDER ~ 1

along with a number of ranches and individual ranchers, seek to overturn a decision by the United States Fish and Wildlife Service ("FWS") limiting livestock grazing on the Little Pend Oreille National Wildlife Refuge ("LPO"). Plaintiffs argue that the FWS's decision violates the National Wildlife Refuge Administration Act of 1966 as amended by the National Wildlife Refuge System Improvement Act of 1997 (the "Improvement Act"), the Administrative Procedures Act ("APA"), and the National Environmental Policy Act ("NEPA"). Plaintiffs also allege that the FWS's decision constitutes a violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

The LPO is an approximately 40,000 acre parcel of land that was designated a National Wildlife Refuge in 1939 "for the use of the Department of Agriculture as a refuge and breeding ground for migratory birds and other wildlife," pursuant to Executive Order 8104 signed by President Franklin Roosevelt. 4 Fed. Reg. 1771. The LPO was administered by the FWS from 1939 until 1965, when administration was transferred to the Washington State Department of Fish and Wildlife ("WDFW" formerly known as the Washington Department of Game). Final Habitat Mgmt. Plan at 10, Admin. Rec. ("AR") at 4042. The FWS resumed management in 1994. *Id*. Portions of the land had been used for livestock grazing prior to the land's designation as a National Wildlife Refuge. AR at 4070. Grazing and timber harvest have been the primary form of management administered by the FWS and WDFW. AR at 2622.

In 1996, the FWS performed a preliminary evaluation of livestock grazing in the LPO. AR at 2775. The FWS found that "seasonal grazing in specific locations may . . . enhance waterfowl nesting and feeding areas. [However] [g]razing may detrimentally affect riparian vegetation

ORDER * 2

and associated wildlife communities . . . ." AR at 2776.  The FWS found grazing to be compatible, but noted that staff had not completed any site-specific studies and that the FWS was developing habitat and wildlife management objectives that would address future livestock grazing on the LPO.  *Id.*

On October 9, 1997, the Improvement Act passed, requiring the FWS to prepare a Comprehensive Conservation Plan ("CCP") for each wildlife refuge to determine whether existing uses were compatible with the purpose of the refuge and providing a definition for the term compatible use.  16 U.S.C. § 668dd *et seq*.  In 2000, the FWS released its Final Environmental Impact Statement ("FEIS") for the LPO CCP. AR at 1. The Record of Decision for the LPO CCP Environmental Impact Statement identified the FWS's intent to "[e]liminate the annual grazing program in five years and thereafter use grazing only as habit management tool to achieve wildlife objectives." AR at 4.  In June 2005, the FWS adopted its Habit Management Plan ("HMP") for the LPO, which identified the specific fields where rotational livestock grazing would occur. AR at 4116-17.

Plaintiffs argue that (1) the FWS did not apply its "sound professional judgment," as defined in the Improvement Act, in determining livestock grazing to be largely incompatible with refuge purposes, (2) the FWS should have prepared an Environmental Assessment ("EA") in order to determine whether a full EIS was necessary in creating its HMP, and (3) eliminating the annual grazing program violated Plaintiffs' Fifth Amendment Due Process rights. Both the Federal Defendants and Defendant-Intervenors dispute Plaintiffs' claims and seek a ruling that the FWS complied with the applicable law in finding livestock grazing to be

ORDER * 3

incompatible and in deciding not to prepare an EA. Finally, Defendants ask the Court to find that the FWS's actions did not violate Plaintiffs' Fifth Amendment Due Process rights.

## II. Standard of Review

Summary judgment is appropriate where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party seeking summary judgment must demonstrate there is an absence of disputed issues of material fact to be entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c). In other words, the moving party has the burden of showing no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *Lynn v. Sheet Metal Worker's Intern. Ass'n*, 804 F.2d 1472, 1483 (9th Cir. 1986) (quoting *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir. 1982)). The court is to view the facts and draw inferences in the manner most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Chaffin v. United States*, 176 F.3d 1208, 1213 (9th Cir. 1999).

A burden is also on the party opposing summary judgment to provide sufficient evidence supporting his claims to establish a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 252; *Chaffin*, 186 F.3d at 1213. "[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San*

ORDER * 4

*Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249, 252).

### III. Plaintiffs' Claim Under the Improvement Act

A. Applicable Law

The 1997 Improvement Act requires that "the Secretary shall not . . . renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A)(i). Compatible use is defined as "a wildlife-dependant recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." *Id.* § 668ee(1). Sound professional judgment in turn is defined as "a finding, determination, or decision that is consistent with the principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of this Act and other applicable laws." *Id.* § 668ee(3). In the context of the compatibility of existing uses, the Improvement Act tasked the FWS with determining whether, consistent with the principles of sound fish and wildlife management and administration and available science and resources, livestock grazing would materially interfere with or detract from the fulfillment of the mission of the system.

Citing to Wildlife and Fisheries regulations, Defendant-Intervenors argue that the standard that the FWS must apply is not whether livestock grazing would materially interfere with the mission of the system, but because livestock grazing is an economic use, whether livestock grazing contributes to the achievement of refuge purposes:

ORDER * 5

> We may only authorize public or private economic use of the natural resources of any national wildlife refuge, in accordance with 16 U.S.C. 715s, where we determine that the use contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission . . . Economic use in this section includes but is not limited to grazing livestock . . . .

50 C.F.R. § 29.1. However, this regulation went into effect on November 17, 2000, several months after the FWS had completed the FEIS for the LPO. Final Compatibility Regulations Pursuant to the Improvement Act, 65 Fed. Reg. 62,458-01 (October 18, 2000) (to be codified at 50 C.F.R. pts. 25, 26, & 29). This Court will evaluate the actions of the FWS based on the law at the time those actions occurred and therefore will focus on whether the FWS's actions comply with the text of the Improvement Act.

B. Deference to Agency Action

The Ninth Circuit has described the level of deference a court must accord an agency action as lying along a continuum. *Wilderness Soc'y v. United States Fish & Wildlife Serv.,* 316 F.3d 913, 921 (9th Cir. 2003). Courts are to accord agency action a high level of deference, referred to as *Chevron* deference, when an agency interprets an ambiguous statute, *see Chevron U.S.A, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984), or when an agency acts pursuant to delegated authority, *see United States v. Mead Corp,* 533 U.S. 218, 226-27 (2001). On the other end of the spectrum, courts give no deference to agency action that contravenes Congress' expressed intent. *Chevron,* 467 U.S. at 842-43 ("[i]f the intent of congress is clear that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). Similarly, agency interpretations advanced for the first time in a litigation brief receive no deference.

ORDER * 6

*See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213 (1988). Thus, in determining the level of deference to apply to a given action, courts should determine where on the continuum the action lies.

In the instant case, the parties focus on two different agency actions: (1) the methodology the FWS employed in making its compatibility determination, and (2) the underlying finding that the annual livestock grazing program is not a compatible use of the LPO. Plaintiffs argue that the statutory definition of sound professional judgment, "a finding, determination, or decision that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of this Act and other applicable laws," 16 U.S.C. § 668ee(3), requires site-specific scientifically controlled studies regarding whether grazing is a compatible use. The Court finds that the text of the statute does not require site-specific scientifically controlled studies focusing on grazing, rather, as the text states, sound professional judgment should be based on available science. As detailed below, the Court finds that the FWS's non-compatibility determination was consistent with the principles of sound fish and wildlife management and available science.

The more basic agency action was the determination that the annual livestock grazing program was not a compatible use of the LPO. The very use of the term sound professional judgment constitutes a grant of authority by Congress to the FWS. *See Wilderness Soc'y,* 316 F.3d at 928-29. Other factors that heighten the deference owed to the FWS's non-compatibility finding include the FWS's expertise in the area of habitat management and the fact that the 2000 FEIS for the LPO CCP was issued after a rigorous and transparent process of notice and comment. *Mead*

ORDER \* 7

*Corp.,* 533 U.S. at 227. Therefore, the Court finds that the FWS's non-compatibility finding should be owed a relatively high degree of deference.

C. The Evidence for a Finding of Non-Compatibility

Plaintiffs argue that the FWS was biased in its review and that the scientific evidence demonstrates that livestock grazing is a compatible use of the LPO. Plaintiffs point to the following arguments in support of this contention: (1) livestock grazing has been recognized as a habitat management tool, AR at 5295, (2) certain studies show that livestock grazing can have a positive or neutral impact on wildlife habitat, AR at 2234 to 2244, (3) livestock grazing has occurred on the LPO since before its inception, and (4) the record contains no site specific "scientifically valid studies which showed that the grazing program was in fact materially interfering with wildlife management." (Ct. Rec. 58 at 5 to 10.) Based on this assessment, Plaintiffs argue that using sound professional judgment, the FWS could not have found livestock grazing to be an incompatible use.

At oral argument, Plaintiffs emphasized their contention that site-specific controlled studies focusing on the impact of livestock grazing were needed in order for the FWS to make a non-compatibility finding. Without such studies, Plaintiffs argued, the FWS's decision to find the annual grazing program non-compatible with refuge goals was arbitrary and capricious, and therefore violative of the Administrative Procedures Act and the Improvement Act. Defendants countered that because the compatibility decision is based on the director's sound professional judgment and available science, there is no requirement that the FWS conduct site-specific controlled studies. Defendants argued further that

ORDER * 8

those site-specific studies that were conducted support their contention that the annual livestock grazing program was not compatible with the goals of the refuge.

As noted in the previous section, the text of the Improvement Act does not require the FWS to conduct scientifically controlled studies at every individual site to determine whether a particular use is compatible in that location. Rather, the Director is charged with using his or her sound professional judgment and available science to determine what uses are compatible. 16 U.S.C. § 668dd. While Plaintiffs correctly note that there are documented instances in which limited livestock grazing can have a beneficial impact on certain refuge goals, such as forest management, *see* AR at 5316, there exists a large body of scientific evidence cataloguing the specific negative effects of grazing on primary refuge goals, such as the maintenance of riparian habitat and migratory bird populations. *See e.g.* AR at 5481, 5484, 5496, 5522, & 5620. Thus, while site-specific evaluations maybe helpful in determining the extent to which livestock grazing has impacted the LPO, the FWS has no obligation to demonstrate facts that have already been accepted within the scientific community, such as the predominantly negative impacts of livestock grazing on riparian wildlife habitat.

Defendants do not contest Plaintiffs' claims that *limited* livestock grazing, as opposed to the entire annual livestock grazing program, can be used as a habitat management tool, that in certain limited situations livestock grazing can have a positive or neutral impact, and that livestock grazing has occurred on the LPO since before it was designated as a refuge. However, Defendants do contest Plaintiffs' claims that the

site specific studies do not demonstrate that the annual livestock grazing program materially interfered with wildlife management.

The site-specific studies referenced by the parties include "a 1996 grazing review, fisheries habitat surveys of the Little Pend Oreille River and Bear Creek in 1996 and 1997, and a riparian condition evaluation on 32 valley units of five Refuge streams in 1996 and 1997." AR 336 at 116.[1]  One of these documents that was heavily cited by all parties was an Evaluation of Riparian Areas of the Little Pend Orielle National Wildlife Refuge, Washington, drafted by W. H. Pyle, a wildlife biologist.  AR at 7431.  Plaintiffs argue that this document evaluated the current condition of riparian areas, but "never purported to study the causes of the underlying conditions which he observed," rather, the author merely speculated on the causes of those conditions (Ct. Rec. 58 at 7).  However, the evaluation concluded that more than 50 percent of the riparian habitat of the refuge was in unsatisfactory condition.  AR at 7441.  The evaluation found that "[t]he unsatisfactory condition of prominent alluvial valleys was attributed to several interacting factors including: the history of intensive site use by people and livestock during the early settlement period (homesteading era); . . . continued overuse of herbaceous vegetation by cattle that summerred [sic] primarily in riparian areas."  AR at 7441-42.

---

[1] Throughout this Order the administrative record is cited to as AR at [page number], however, the Final CCP and EIS, which starts at page 336 of the administrative record, is not paginated in accordance with the rest of the administrative record.  The record cited here is page 116 of the document beginning at page 336 of the administrative record.

ORDER * 10

Plaintiffs make the same argument with respect to fish habitat assessments included in the administrative record at 6454.

> [T]hese fish habitat assessments attempted to survey existing conditions on the refuge, specifically with respect to fish habitat. And, while the authors do occasionally speculate as to the cause of various observed conditions, including the speculation that grazing may be having various impacts, the studies never purport to scientifically evaluate or prove this fact.

(Ct. Rec. 58 at 7.) While it is true that the purpose of the fish habitat assessments was not to prove specific impacts of livestock grazing, there is no question that the assessments catalogue various negative impacts and recommend the elimination of livestock grazing.

> Bank erosion in [Reach 2] was extremely high. There were 9,242 linear feet of actively eroding banks which were 34% of the stream banks. Only 14 of 125 units had no erosion. Cows were present in many areas in and along the stream. There were many areas where their hooves had sheared off the banks. Throughout the reach large clumps of sod were observed in the stream.

AR at 6466.

> Elimination or modification of the grazing regime in riparian areas should allow for more vegetative growth. This would subsequently increase stream shading, decreasing stream temperatures. It would also capture sediments, building up the stream banks, narrowing and deepening the stream. This would also stabilize the banks and reduce sediment input to the stream through filtration.

AR at 6509. As numerous scientific studies, such as the those cited in the administrative record at pages 5481, 5496, and 5522, have previously conclusively demonstrated the negative impacts of livestock grazing on riparian habitat, and the site specific fish habitat assessments quoted above included observations of conditions previously associated with livestock grazing, these studies provide actual evidence that livestock grazing was having a negative impact on the LPO, contrary to Plaintiffs' assertions otherwise.

ORDER * 11

The question before the Court is whether there is adequate evidence in the administrative record for the FWS regional director to have concluded that, in his sound professional judgment, the annual livestock grazing program on the LPO would materially interfere with or detract from the fulfillment of the mission of the refuge system. Taking into account the general scientific literature evaluating the negative impacts of livestock grazing on wildlife habitat, as well as the possible benefits, and after reviewing the evaluations conducted by wildlife biologists regarding the negative impacts of livestock grazing at the LPO, the Court finds that the administrative record supports the regional director's finding. Therefore, Plaintiffs' motion for summary judgment is denied with respect to Plaintiffs' claim that the FWS's finding that the annual livestock grazing program is incompatible with refuge goals is contrary to the Improvement Act or NEPA. Defendants' motions for summary judgment are granted in that respect.

**IV. Plaintiffs' Claims Regarding FWS's Failure to Abide by the NEPA**

Plaintiffs argue that NEPA mandated that the FWS conduct an EIS before approval of the HMP, but that even "if an EIS may be unnecessary, then the FWS still has an obligation to prepare an EA [Environmental Assessment] and a FONSI [Finding of No Significant Impact]." (Ct. Rec. 46 at 12 to 13.) Rather than preparing an EIS or an EA and a FONSI, the FWS prepared an Environmental Action Statement for the HMP, and argues that the "CCP FEIS fully explained the environmental impacts of termination of the historic grazing program . . . ." (Ct. Rec. 53 at 13.)

The regulations implementing NEPA require the preparation of an EA "when necessary under the procedures adopted by individual agencies . .

ORDER * 12

. ." 40 C.F.R. § 1501.3(a). According to the Ninth Circuit, a subsequent EIS is unnecessary if an earlier EIS has addressed the impact of a given agency action.

> In many ways, a programmatic EIS is superior to a limited, contract-specific EIS because it examines an entire policy initiative rather than performing a piecemeal analysis within the structure of a single agency action. Absent intervening changes which would raise staleness concerns, the Administrator did not err by issuing a single, programmatic EIS.

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,* 126 F.3d 1158, 1184 (9th Cir. 1997). In a case analogous to the instant case,

> each national forest prepares a forest plan in accordance with the National Forest Management Act ("NFMA"). Each forest plan is accompanied by an environmental impact statement prepared in accordance with NEPA. The impact statement is "programmatic" in that it is issued along with the NFMA-mandated forest plan. *Sierra Club v. Robertson*, 784 F.Supp. 593, 602 (W.D.Ark.1991). A comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered. *Id.* at 602-03. If issues develop concerning a specific project, the Forest Service may prepare an environmental assessment to determine whether a supplement to the impact statement is required. 40 C.F.R. § 1508.9(a); *Sierra Club*, 784 F.Supp. at 603.

*Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir. 1994) (footnote omitted). Based on the above-cited cases, an additional EIS is necessary only when new and significant environmental impacts arise that were not previously considered. Similarly, an environmental assessment is only needed if "issues develop concerning a specific project." Plaintiffs failed to identify any issues that developed between the adoption of the 2000 CCP FEIS and the 2005 HMP that would require the preparation of an EA.

Given Plaintiffs' failure to allege developments between adoption of the CCP FEIS and the HMP that would require preparation of an EA,

ORDER ~ 13

Plaintiffs' motion for summary judgment regarding Plaintiffs' NEPA claim is denied. Defendants' motions for summary judgment are granted in that respect.

## V. Plaintiffs' Claims Regarding a
## Fifth Amendment Due Process Violation

Plaintiffs argue that the FWS violated Plaintiffs' Fifth Amendment due process rights when the FWS eliminated the annual grazing program on the LPO and significantly limited overall livestock grazing. Specifically, Plaintiffs claim that because certain grazing permits have been consistently renewed for more than 60 years, Plaintiffs have developed a property interest under the Due Process Clause consistent with other government benefits that have been recognized as property interests such as welfare benefits and vehicle licenses. The Supreme Court has ruled that, when evaluating a due process claim, a court must first determine whether a property interest exists, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' . . . Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 59 (1999).

Thus, the first question for the Court here is whether the FWS deprived Plaintiffs of a protected property or liberty interest. The Ninth Circuit has found that the regular renewal of grazing permits does not create a compensable property interest, "non-Indian permittees assert that their grazing permits are property rights which the government may not revoke or modify without compensation. We reject this assertion. The license to graze on public lands has always been a revocable privilege."

ORDER * 14

*Swim v. Bergland,* 696 F.2d 712, 719 (9th Cir. 1983).  Therefore, Ninth Circuit case law compels this Court to find that no property interest in livestock grazing permits exist.

More generally, the Ninth Circuit describes the process for analyzing whether a property interest exists as follows:

> "A property interest in a benefit protected by the due process clause results from a legitimate claim of entitlement created and defined by an independent source, such as state or federal law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). This interest does not arise "whenever a person has only 'an abstract need or desire for' or 'unilateral expectation of,' a benefit." *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir.1982) (quoting *Board of Regents v. Roth*, supra, 408 U.S. at 577, 92 S.Ct. at 2709). A reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms. *See Griffeth v. Detrich*, 603 F.2d 118 (9th Cir.1979), cert. denied, 445 U.S. 970, 100 S.Ct. 1348, 64 L.Ed.2d 247 (1980).

*Ass'n of Orange County Deputy Sheriffs v. Gates,* 716 F.2d 733, 734 (9th Cir. 1983).  The Tenth Circuit conducted such an analysis with regard to whether permittees have a legitimate due process claim to the terms and conditions of grazing permits, finding that no such claim exists.  *Fed. Lands Legal Consortium v. United States,* 195 F.3d 1190, 1198-99 (10th Cir. 1999).  In the instant case, there is no statutory language creating an entitlement to grazing permits that is couched in mandatory terms, rather, the Improvement Act requires that the FWS not renew an existing use that has not been deemed compatible.  16 U.S.C. § 668dd(d)(3)(A)(I).  Therefore, the explicit statutory language contradicts Plaintiffs' argument that individual ranchers are entitled to renewal of livestock grazing permits or that a property interest has been created in the livestock grazing permits.

ORDER ~ 15

Given the Court's finding that Plaintiffs have no property interest in the renewal of grazing permits, Plaintiffs' motion for summary judgment with respect to Plaintiffs' due process claim is denied. Defendants' motions are granted in that respect.

In the alternative, if Plaintiffs were to have established a property interest in the renewal of livestock grazing permits, Plaintiffs received adequate due process for the denial of those permits. Plaintiffs had the opportunity to comment on the CCP before it was finalized. AR at 1061. The FWS invited ranchers to submit their own alternative to the CCP livestock grazing program. AR at 2278. Plaintiffs had the opportunity to appeal the FWS's decision not to renew their livestock grazing permits but failed to do so. 50 C.F.R. § 25.45. Given these procedural protections, any property interests asserted by Plaintiffs were adequately protected. Therefore, Plaintiffs' motion for summary judgment with respect to Plaintiffs' due process claim is denied.

## VI. Conclusion

Based on the above analysis Plaintiffs' Motion for Summary Judgment is denied in all respects and Federal-Defendants' Motion for Summary Judgment and Defendant-Intervenors' Cross Motion for Summary Judgment are granted in all respects.

Accordingly, **IT IS HEREBY ORDERED:** Plaintiffs' Motion for Summary Judgment **(Ct. Rec. 46)** is **DENIED,** and Federal Defendants' Motion for Summary Judgment **(Ct. Rec. 52)** and Defendant-Intervenors' Cross-Motion for Summary Judgment **(Ct. Rec. 50)** are **GRANTED.**

///
///
///

ORDER * 16

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide copies to all counsel, enter judgment in favor of Defendants, and close the file.

**DATED** this 20th day of August 2007.

s/Edward F. Shea<br>
EDWARD F. SHEA<br>
United States District Judge

Q:\Civil\2006\0156.MSJ.wpd

ORDER * 17